# CIRCUIT COURT, U. S.

## BALTIMORE, MAY TERM, 1815.

*Present*—Hon. Duvall and Bland.

United States<br>
     v.    }   TREASON.<br>
John Hodges, Esq. 

*Elias Glenn*, Esq. Counsel for the United States.

*U. S. Heath*, *J. E. Hall*, and *Wm. Pinckney*, Esqrs. Counsel for the Prisoner.

The facts of the case were as follows : while the British army was on the retreat from the city of Washington, last summer, as they passed through George county, some of the people of the town of Upper Marlborough, took four stragglers, who were following the army. They were sent into the interior of the country together with a deserter. As soon as they were missed, they were demanded by the British commander, under a threat that the town should be destroyed if they were not obeyed. Communications passed between the two parties, the result of which was that the men were restored to the enemy.

It appeared by the testimony of John Randall and others, that on Saturday after the engagement at Bladensburgh, General Bowie brought three prisoners to Queen Anne, and asked Randall to stand guard over them, which he did. During the night Mr. William Lansdale brought another. Early in the morning the prisoner and his brother appeared and demanded them; they said that the British had threatened to destroy the

It is the duty of the Court to declare what the law is to the jury when requested, either by the prosecutor or the prisoner, in any stage of the case; but the jury are not bound by their direction.

Delivering up prisoners and deserters to the enemy, is adhering to them, giving them aid and comfort, and is treason against the U. States. Nothing will excuse the act but a wellgrounded fear of life. When the act amounts to treason, it involves the intention.

BALTI-
MORE,
May, 1815.

U. States
v.
Hodges.

town, unless this requisition was obeyed before 12 o'clock, &c. and that they would hold their wives and children as hostages.

The witness sent for General Bowie, who at first refused to suffer them to go ; upon an explanation of the threat, he said it was hard, but he supposed they must be returned. They were delivered up to the prisoner, who surrendered them to the British.

*Mr. Pinckney* on behalf of the prisoner, read an address from the grand jury to the President of the United States, in which the jurors expressed their respect for the motives of the prisoner, and prayed a nolle prosequi.

*Mr. Glenn* prayed the court to direct the jury that the mere act of delivering up prisoners or deserters, is an overt act of high treason.

*Pinckney.* There is no law in this prayer, for it excludes that which is the essence of the offence, intention ; and if it was otherwise, the court has no right to instruct the jury, as if this were a civil case. No instance has occurred in modern times of an attempt to bind the jury in such a case by the opinion of the court. What remedy is there for the party if you err ? We may appeal to a higher tribunal, it is true, but what is the consequence ? The man is hanged, and your judgment is reversed.

In England, did their courts interfere in this mode in the celebrated cases of Hardy, and Horne Tooke and others ? No, it would not have been endured. The best security for the rights of individuals is to be found in the trial by jury. But the excellence of this institution consists in its exclusive power. The jury are here judges of law and fact, and are responsible only to God, to the prisoner, and to their own consciences. After the case is

*closed,* you may indeed *advise* the jury, if they ask it, or if you think proper to do so; without being asked by them. But to interrupt the progress of the trial in the way proposed would be monstrous. Suppose the court to give the direction, I shall not submit to it as the prisoner's counsel. I will, on the contrary, tell the jury that it is not law. It is my right to do so, and in a case of blood, I dare not forego the exercise of it. I trust I shall not be placed in a predicament which will thus set my duty to a man whose life is in my charge, against my respect for this tribunal. I pray your honours to suffer this cause to go on in the customary and legal manner.

*Glenn* observed, that it was the practice every day in the criminal court, and appealed to one of the counsel for the prisoner, whose long career as a public prosecutor must have furnished innumerable instances.

*Jennings,* for the prisoner, said, that being thus called upon, he was sorry he could not aid the District Attorney by any such precedent. He never knew an instance, while he was prosecutor for the state, of praying a direction on behalf of the state, though it was frequently done by the traverser.

The court said, they were bound to declare the law whenever they were called upon, in civil or criminal cases; in the latter, however, it was their duty to inform the jury that they were not obliged to take their direction as the law. In the case at bar, they declined giving any opinion at present, being desirous to hear counsel.

*Glenn* then said he would not now address the jury.

*Pinckney* regretted that his learned friend across the table had not seen fit to come forward in support of his

<div style="text-align: right">

BALTI-
MORE,
May, 1815.

U. States
v.
Hodges.

</div>

case, as he wished to have delivered a brief homily on the law of treason; not indeed for the benefit of his client, but for the instruction of others, who appeared to stand in need of it.

*Mr. Glenn*, in support of his prayer, read to the court the following authorities: 1. East, C. L. p. 70. If the joining with rebels be from fear of present death, and while the party is under actual force, such fear and compulsion will excuse him.

But an apprehension ever so well grounded, of having property wasted or destroyed, or suffering any other mischief, not endangering the person of the party, will be no excuse for joining or continuing with rebels. Ibid. p. 71.

2 Dall. 346. Vigol's case. This was an indictment for high treason, in levying war against the United States. Patterson, who presided in that case, said there were two points for consideration—the facts and the intention. He stated the evidence and the design, and concluded that the combination of these facts with this design, consummated the crime of high treason in the contemplation of the constitution and law of the United States. It may not, said the judge, be useless, on this occasion, to observe, that the fear which the law recognizes as an excuse for the perpetration of an offence, must proceed from an immediate and actual danger, threatening the life of the party. The apprehension of any loss of property, by waste or fire, or even an apprehension of a slight or remote injury to the person, furnish no excuse.

The counsel then read Cranbourn's case from Salk. p 633. He then admitted that he must prove a certain portion of the intention, and that in the present case there was but two inquiries to be made.

1st. Did he deliver up the prisoners?

2d. Did he intend to do so?

Both these questions must be answered affirmatively; and therefore the treason was proved, and he had no more to say upon the subject.

*Pinckney.* Nothing but an utter confusion of ideas could have introduced a doubt upon the subject. The gentleman's prayer excluded all idea of criminal intention; or it relied upon the influence of criminal motive, as a necessary corollary from the naked facts charged, as the overt acts in the indictment.

It might be affirmed as an universal proposition, that criminal intention is the essence of very species of crime. All indictments commence with an assertion of corrupt motives; and in indictments for treason, the overt acts laid are to show the manner in which the wicked intention is carried into execution. In the speeches Lord Erskine, to whom the world is so largely indebted for a correct knowledge of the principles of civil liberty and the law of treason, you will find him perpetually contending, and contending with effect, that although the crown had proved the facts charged, it had not shown the evil design, the corrupt purpose, without which the facts are nothing.

The Counsel then referred to, and read part of Mr. Erskine's remarks in the case of Lord George Gordon. In that case it was proved that the prisoner incited the acts which produced the consequences complained of, yet he was acquitted, because he was not the enemy of the king, nor the friend of any man who was his enemy.

Take the case of a man who, in time of war, is charged

<div style="margin-right">BALTI-
MORE,
May, 1815.

U. States
v.
Hodges.</div>

with the defence of an important fortress or castle, which he surrenders to an incompetent force.    What more effectual means could he have adopted to aid the enemy than the delivery of this fortress ?    The books will tell you, that if he was bribed to this desertion of his duty—if he did it with a view to benefit the enemy, he is guilty of treason. But if pusillanimity was the cause, or if it arose from a false calculation of his own means, or the force of the enemy, he is not a traitor. You may banish him with ignominy from the ranks which he has disgraced, or try him by martial law as a coward or a fool ; but he has committed no treason.

Suppose a powerful force to invade the country, to which resistance is hopeless ; they levy contributions ; they do not proclaim that they will hang me if I neglect to comply with this order; but they threaten plunder and desolation. I know they have the power to execute that threat—and I comply accordingly. Now the paying of money, or the furnishing of provision, is an assistance; it is " giving aid and comfort" much more effectually than the delivery of a few prisoners or a deserter.    Yet no man will call this treason ; because there is no evidence of hostility to the interests of the country.    The authorities say it is not treason.

In *Stone's* case (1 East's C. L. 79.) the indictment charged as an overt act of adherence to the enemy, that the prisoner conspired, with others to collect intelligence within England and Ireland, of the disposition of the king's subjects, in case of an invasion of either country, and to communicate such intelligence to the enemy.    The tendency of parts of the correspondence, which was given in evidence, was to advise the enemy against an invasion of England, by representing the improbability of its being attended with any success, from the general disposition of the people.

Now it was scarcely possible that such a correspondence could have been opened and maintained with other than cor-

rupt motives.    Yet the counsel were allowed to argue that the letters were transmitted with a good intent, in order to avert the danger of so great a calamity as an invasion. And the Court said, the jury were to judge from all the circumstances, whether the intelligence had been sent with that view.

My client is charged, as Stone was charged, with being an *adherent ;* and like him is entitled to be sheltered by his motives from the imputation of treason :    The District Attorney confounds the indictment which you are now try-ing with an indictment for levying war.    I admit that it has been decided, that if a man becomes an integral part of the enemy's force, and acts with it, he necessarily lev-ies war, and is guilty of treason, unless it appears that he did so *pro terrore mortis.*    The law will suffer no other exculpation of such conduct; it will excuse it upon no other motive.    But will the gentlemen refer us to some authority which declares, that if a man, without joining the enemy so as to levy war, does, upon virtuous or even pardonable inducements, (having no reference to the pro-motion of the enemy's views) that which happens, or is calculated, to be advantageous to the enemy, he is therefore a traitor ?    What is an *adherent ?*    Can he be any thing less than a willing partisan, a corrupt auxiliary of the ene-my ?    Such, at least, is the natural and ordinary import of the word ; and you cannot strain it beyond that import by the refinements of construction, to the prejudice of the ac-cused, without reviving the ferocious and appalling doctrine of constructive treason, which once made England bleed at every pore, and stained the palace and the cottage with ju-dicial murder.    The protecting spirit of the constitution, and of the statute which acts upon it, as well as humanity and justice, would be outraged by such a course.

Unlike the conduct of Stone, the conduct of Hodges pre-sents nothing ambiguous to the most zealous scrutiny.    His

honourable feelings and intentions are acknowledged by all: he was urged by the solicitation of those whom he respected: he was led by a generous sympathy for the situation of one who is deservedly dear to all who know him: he was actuated by an apprehension, by no means unreasonable, for the quiet and safety of the affrighted women and helpless children of the neighbourhood, and for the security of the persons and property of the whole district. The treason of adherence cannot be committed by one whose heart is warm with all the honourable feelings of the man and the patriot. "Overt acts undoubtedly do discover the man's intentions; but I conceive they are not to be considered merely as evidence, but as the means made use of to effect the *purposes of the heart.*" Foster, 203.

This is the master key which lets you into the whole secret of this title of the criminal law. Sir Walter Tyrrel, who, in shooting at a deer, killed the king, could not be convicted of treason. The killing was *per infortunium.* So, where a person *non compos* slays another designedly, still he is innocent, because there is no malignity in his heart. So in every homicide, it is felonious, justifiable or excusable, according to the purpose with which the act was perpetrated. It is *murder* where it is done through malice; *manslaughter,* if without malice; where it is done through misfortune, or in self defence, it is *excusable,* and it is *justifiable* when done in advancement of public justice, in obedience to the laws. If the heart be uncontaminated by corrupt intentions, the man is innocent, for it is motive that qualifies actions. As it will be with God, so it is with the man: the latent intention of the heart must be searched.

Look at the *locus in quo*—the scene where the plot of this treason is laid. A hostile force, but the day before, had traversed the country in all the pride of victory. The *jus_belli* was lord of the ascendant. The army, if such a force

may deserve the name, which had been relied upon for the defence of the capitol, had been broken up and dissipated to every quarter of the compass. The country was menaced by an enemy, with whom, to adopt the language of Cæsar, it was easier to do than to say. If I were addressing the jury I might appeal to their love of country. I might remind them that they are administering law for posterity as well as for us. But I am addressing a tribunal where these considerations have their full weight, and I expect with confidence that the court will vindicate the doctrines which I have had the honor to advance.

[After considerable delay, occasioned by the examination of the authorities, the court proceeded to pronounce an opinion.]

DUVALL, C. J.—The Court would have been better satisfied if the whole case had been gone through in the usual way; but as the District Attorney has prayed an opinion on the law, the Court will give their opinion.

1st. Hodges is accused of adhering to the enemy, and the overt act laid consists in the delivery of certain prisoners, and I am of opinion that the overt act laid in the indictment and proved by the witnesses, is high treason against the United States.

2d. When the act itself amounts to treason, it involves the intention, and such was the character of this act. No threat of destruction of property will excuse or justify such an act; nothing but a threat of life, and that likely to be put into execution.

3d. The jury are not bound to conform to this opinion, because they have a right, in all criminal cases, to decide on the law and the facts.

*Houston J.* said he did not entirely agree with the chief justice in any, except the last remark.

*Pinckney* then rose again, and addressed the jury.

The opinion which the chief justice has just delivered is not, and I thank God for it, the law of the land. If you have the slightest doubt on the subject, I will undertake to remove it, to show you that the cases have been misconceived, and that the conclusions drawn from them are erroneous.

No man can feel for the learned judge who has just given

BALTI-  
MORE.  
May, 1815.

U. States.  
v.  
Hodges.

you his instruction, a reverence and affection more sincere than I do. But reverence and affection for him shall not stand in the way of the great duty which I owe to a fellow citizen who relies on me to shield his innocence from the charge of guilt, and his life from an attainder for treason. I had hoped that, since his motives were admitted, on all hands, to be entitled to praise, since the grand jury had associated with their indictment a certificate of the purity of his views, and a solemn recommendation that the prosecution should be abandoned, he would at least have been left by the District Attorney, and the Court, to obtain from you, as he could, a deliverance from the danger that encompassed him. In that hope I have been disappointed. As if the salvation of the state depended upon the conviction of this unfortunate man, whose situation, one would think, an IN-QUISITOR might deplore—the District Attorney has gone out of his way to bring down VENGEANCE upon him; and one of the Court has told you that he is a TRAITOR, and that you ought to find him so.

In a case where justice might be expected to be softened into clemency, and even to connive at acquittal, where every generous sentiment must take part with the accused, and law might be thought to fear the reproach of tyranny, if it should succeed in crushing him; in such a case the established order of trial is deserted, a pernicious novelty is introduced, the court is called upon to mix itself in your deliberations, to mutilate the defence of the prisoner's counsel, to harden your consciences against the solicitations of an enlightened mercy, and to sacrifice the prisoner to gloomy and exterminating principles, which would render the noble and beneficent system of law, for which we are distinguished, a hideous spectacle of cruelty and oppression.— For the sake of the country to which I belong, as well as of my client, I will not only protest before you against these principles, but will examine and speak of them with freedom, restrained only by the decorum which this place requires.

[After several introductory observations, Mr. Pinckney proceeded thus:]

In my argument to the court, I showed that if it be done treacherously, it is treason; but that if the commander act from any motive not corrupt, no indictment can touch him. If the fort be as impregnable as Gibraltar, and be garrisoned with 50,000 men, and it is surrendered to a force of half that number, from motives of fear, the commander cannot be punished as a traitor. What can be more strong to show that upon an indictment for adherence, the law looks into the

heart, and adapts its penalties accordingly? Has that authority been answered?

In the case of Stone, which was parallel with the point, the Court said expressly, if the heart be pure, it matters not how incorrect the conduct. So the counsel argued; and Stone was acquitted. Has any answer been given to that authority? Has any been even attempted?

This indictment charges Hodges with having done certain things, *wickedly, maliciously, and traitorously.* Must not the United States prove what they allege? When the law allows even words to be given in evidence, as explanatory of intention, to exculpate, it admits that exculpation may be made out by proof of innocent motives:—that overt acts *alone* do not furnish a criterion—that concomitant facts, illustrative of the state of the heart, must not be neglected.

A military force levies contributions.—If you pay them, for the purpose of saving the country from farther mischief, although there be no fear or danger of death, the law says this is not treason. By the doctrine of the chief justice, however, it is treason, and consequently his doctrine is unsound.

On this occasion, the enemy were in complete power in the district where the transactions occurred, which are complained of in the indictment. They were unawed by the thing which we called an army, for it had fled in every direction. They were omnipotent. The law of war prevailed, and every other law was silent. The domestic code was suspended. They menaced pillage and conflagration; and after they had wantonly destroyed edifices which all civilized warfare had hitherto respected, was it to be believed that they would spare a petty village, which had renewed hostilities, before the seal of its capitulation was dry? There was menace—power to execute—probability—nay, certainty, that it would be executed.

How, then, can you find a wicked and traitorous motive in the breast of my client?

There is not only the absence of any wicked motive, but there is the visible presence of those which are laudable: an attachment to Dr. Beanes—anxiety for the defenceless people about him—a desire to preserve the country from the afflictions which hung over it. In conduct so characterized, so produced, we discover the operations of an excellent heart, upon a mind which virtuous inducements could betray into error; but what way we can distort it into treason, I have not yet been able distinctly to learn.

The *conduct* is in itself treasonable, says the chief justice, it necessarily imports the wicked intention charged by the

BALTI-
MORE.

U. States
v.
Hodges.

BALTI-
MORE,
Dec. 1823.

U. States,
v.
Hodges.

indictment.  The construction makes it treason, because it *aids and comforts the enemy.*

These are strong and comprehensive positions; but they have not been proved; and they cannot be proved until we relapse into the gulf of constructive treason, from which our ancestors in another country have long since escaped.

GRACIOUS GOD! In the nineteenth century, to talk of constructive treason! Is it possible that in this favoured land—this last asylum of liberty—blest with all that can render a nation happy at home and respected abroad—this should be law? No. I stand up as a man to rescue my country from this reproach. I say there is no colour for this slander upon our jurisprudence. Had I thought otherwise I should have asked for mercy—not for law. I would have sent my client to the feet of the president, not have brought him, with bold defiance, to confront his accusers, and demand your verdict. He could have had a *nolle prosequi.* I confirmed him in his resolution not to ask it, by telling him that he was safe without it. Under these circumstances I may claim some respect for my opinion. My opportunities for forming a judgment upon this subject, I am compelled to say, by the strange turn which this cause has taken, are superior to those of the chief justice. I say nothing of the knowledge which long study and extensive practice enabled me to bring to the consideration of the case. I rely upon this; my opinion has not been *hastily* formed—*since the commencement of the trial.* It is the result of a deliberate examination of all the authorities, of a thorough investigation of the law of treason in all its forms, made at leisure, and under a deep sense of a fearful responsibility of my client. It depends upon me whether he should submit himself to your justice, or use with the chief magistrate the intercession of the grand jury, which could not have failed to have been successful. You are charged with his life and honour, because I assured him that the law was a pledge for the security of both. I declared to him that I would stake my own life upon the safety of his; and I declare to you now that you have as much power to shed the blood of the advocate as to harm the client whom he defends.

If the mere naked fact of delivery constitute the crime of treason, why not hang the man who goes under a flag of truce to return or exchange prisoners? According to the doctrine of the Chief Justice, this man is equally guilty with him who stands at the bar, if you are forbidden to examine his mind, but are commanded by the law to look only to his acts. I ask you to consider this, in the spirit of Stone's case: that doctrine, I pledge myself, goes through every nerve and artery of the law.

If the doctrine of the Chief Justice be the law of the land, every man concerned in the deeds of blood, that were acted during our recent war, was a murderer.

Our gallant soldiers who had repulsed the hostile step whenever it trod upon our shores; our gallant tars who unfurled our flag, acquired for us a name and rank upon the ocean which will not soon be obliterated—these are all liable to be arraigned at this bar. These men have carried dismay and death into the ranks of the foe; blood calls for blood. You dare not inquire into the causes which produced the circumstances; which attended the motives; which prompted the deeds of carnage. The act, you are told by the Chief Justice, and such is the reasoning of the attorney general, involves the intent.

Gentlemen! this desolating doctrine would sweep us from the face of the earth. Even when we deserved to be crowned with laurels, we should be stretched on a gibbet. I tremble for my children, for my country, when I reflect upon the consequences of these detestable tenets which reduces indiscretion and wickedness to the same level. Which of you is there that in some unguarded moment may not, with honest motives, be imprudent? Which of you can hope to pass through life without the imputation of crime, if your motives may be separated from your conduct, and guilt may be fastened upon your actions, although the heart be innocent?

Gentlemen! so solemnly, so deeply, so religiously do I feel impressed with this principle, that I know not how to leave the case with you, although at the present moment it strikes my mind in so clear a light that I know not how to make it more clear.

If this damnable prosecution should prevail, it would be the duty of the district attorney instantly to arraign Gen. Bowie, one of the witnesses in this case. than whom a purer patriot never lived.—Nay, half Prince George's county would come within its baleful influence.

Yet such is the law the Chief Justice recommends to you.— His associate does not concur with him. In this conflict of opinion I should be entitled to your verdict; but I rest the case upon more exalted grounds. I call upon you as honourable men, as you are just, as you value your liberties, as you prize your constitution, to say—and to say it promptly, that my client is not guilty.

The jury, without hesitating a moment, rendered a verdict of *Not Guilty*.